FRANCIS FARLEY
and Simon Farley, brothers, british subjects and fathers each of several children, in the year 1755, bought of William Byrd 26000 acres of land, called the Saura town, or the land of Eden, in Northcarolina, for 1000 pounds of sterling money, the conveyance was to Francis Farley and Simon Farley and to their heirs, they bought also, together with one Francis Miller, several parcels of land, in the county of Norfolk in Virginia, which were conveyed to the three purchasers, and to their heirs :
Simon Farley paid one half of the purchase-money for the land in Northcarolina, and one third part of the purchase money for the land in Virginia, slaves belonging to both the brothers were employed in cultivating the Northcarolina land : and Francis Farley debited Simon with one half of certain expenses incurred many years after the death of the later, on account of that estate.
*255 The whole business of treating for the purchases, taking the conveyances, and managing the estates, was transacted by Francis Farley, who was several times in Virginia, his brother residing in Antigua.
Simon Farley died about the year 1756 and, by his testament, whereof he appointed his brother Francis one of the executors, his children, the plaintiffs, to whom the said Francis was appointed testamentary guardian, with others, clame what they now demand, which is one half of the Northcarolina land, and one third part of the Virginia land.
After his death, Francis Farley bought from Francis Miller his third part of the land in Virginia.
25 of january, 1757, Francis Farley wrote to Francis Miller a letter in these words : i pray the favor of you to send me by the first opportunity a copy of the sale or conveyance to my brother and myself of the land bought from col. Byrd, for, as my brother is dead, i am as survivor entitled by law to the whole, so i ivant the sale, that i may have a conveyance drawn for one half to my brothers children ; for god forbid i should ever take such an advantage as his death gives me ; and, for this reason, i want coyoles of those other lands bought between you, him and myself * * * the sooner you send me these papers the better, and the more will you oblige me; for life is very uncertain, and i want to get this business done for fear of accidents.
In another letter, dated 14 of august, 1758, from Francis Farley to Francis Miller, are these words: i imagine some of my last letters to you have miscarried, as you take no notice in yours to me of some things i mentioned to you particularly the sending me copies of the conveyance made by col. Byrd to my brother and myself of the land we bought of him in Caro-Una. i have mentioned this two or three times, and must beg you will furnish me with it, by the very first opportunity: do not send the original deed,, but copies by two opportunities, i ivant it prodigiously that i may settle the matter, lest any accident should happen my life; -and god forbid that i or mine should take the advantage the law gives, by my surviving my poor brother ; and i find you are of the same honest and honourable way of thinking, so you will be so kind to have this matter settled with you by a proper deed as to your survivorship, ivitli regard to the lands we purchased in partnership in Virginia, charge me for all the expenses that may attend your doing it, and sending copies of the deed from col. Byrd.
In a letter from Francis Farley to his son, James Parke Farley, dated the 31 of march, 1772, are these words: i believe Jack Farley will soon be obliged to go with the regiment to *256 Ireland, do. that poor family will % fear be infallibly ruined, and obliged to sell their share of the land of Eden.
In a letter from Francis Farley to John Simon Farley, dated 11 of june, 1ÍÍÍ, are these words : i am very apprehensive, that, if the arnericans find out you are one of the Icings officers they will confiscate your lands in America, in that case you will have nothing to depend upon but your commission, and I shall lose above 3000 pounds.
In a latter from Francis Farley to John Simon Farley, dated 13 of July, 1118, are these words : if you do not quit the army you void certainly lose your property in Northamerica, which i trust is worth more than a colonels commission, and a regiment, or two or three regiments * * * surely you cannot have the least doubt whether it will be best to preserve valuable property, in such a country, or to continue a slave in the army of a very declining almost ruined country * * * in my last i said, i should not.again presume to advise you, but, in a very short time, things are so vastly altered, i cannot help attempting it once more, i then thought that all of us who had property in Northamerica, and were absent from the country, would forfeit it, but from the late accounts we have, we find the congress acts upon more liberal principles, and intend to give time to all absentees to return and dame their property, even those that deserted them in the day of distress, and bore arms against them; but, if they do not return in a certain limited time, their property is to be confiscated, and you may take for granted, they will have no partiality towards an officer in the kings service, i therefore hope you ivill see this matter in the light i do, and think it better to part with the commission you notv have, and come over to be ready to go to America to dame ¿your property, soon as matters are settled, than to lose considerable property in a very growing country. * * * p. s. if you have purchased a captains commission before you receive this, i must beg you will sell it, &c. then go to America to dame your land, if you should not like to remain in that country, you may sell the land, and live in a country you like better, you cannot afford, to lose that land.
The writing which, after the death of Francis Farley, was proved for bis testament, and by which all his estate in Northcarolina and Virginia was devised (a) to the children of his son, James Parke Farley, the female defendents, without *257 making any declaration in favor of the plaintiffs, was lodged in the hands of Thomas Warner, attorney general of Antigua, the counsil of that testator, with a' paper, on which were written by his direction the following words: my late brother Simon Earley, was half concerned with me in the purchase of a tract of land from the honourable William Byrd esquire and Elizabeth his wife, and known by the name of Saura town, or the land of Eden, in the province or state of Northcarolina. he ivas also one third concern with mr. Francis Miller of Virginia merchant, and myself, in the purchase of the following tracts of land, viz.
one tract purchased from Robert Ives and Keiza. his wife, one ditto do. from Anne Ludgall widow, John Biggs and Bathk» his wife, William Dale and Mary his wife, and Sarah Lugdall Spinster. one do. do. from John Ivy and Elizabeth his wife¡ one do. do. from James Tucker. note i have since purchased Francis Millers tide to Ms one third part, so that i now possess two third parts of these several tracts of land.
My late brother is no how concerned with me in the great dismal swamp, or any other lands that i have in Virginia or North-carolina, except the five parcels above mentioned, and a man who in march, 1779, had been sent for the said testamentary-writing in order to return it to Francis Farley, was informed by the counsil, that Francis Farley had wished to make a declaration dn his will, as to the title of John Simon Farley to the said lands in America, which the counsil, as he informed the messenger, declined to do from reasons of policy, and Francis Farley, when the testament was brought to him, with that information, lamented that such declaration could not be made.
To the bill of the plaintiffs, who insisted that Francis Farley held in trust for their benefit the proportions of the lands now clamed by them, and prayed a decree for an execution of the trust, and for the rents and profits, the defendents, by their answer, relying upon their legal title by survivorship, and not admitting the existence of the trust, alledged the plaintiffs to be aliens, disabled to hold lands of inheritance, in any of the united american states, and consequently to maintain any action for recovery thereof; and, as to the land in Northcarolina, excepted to the jurisdiction of this court, and objected, that the action of the plaintiffs was barred by the statute for limitation of actions, in that country.
The cause was argued the 18 day of march, 1794.
*258 BY THE COURT.
I. The first question is, whether Francis Farley was a trustee for his brothers children, the plaintiffs, as to one moiety of the Northcarolina, and as to one third part of the Virginia, lands? for, if he were a trustee, the defendants, volunteer clamante under him, are in the same predicament undoubtedly.
In the case between Fisher and Wigg, Peere Williams, b. 1. p. 21. reports Chief Justice Holt to have said, jointenancy is favored in law ; (b) because as the lato does not love fractions of *259 estates; so neither does it encourage divisions of tenures, or multiplication of services, now as long as the jointenancy continues, there is a joint tenure, hut when the tenacy becomes in common, then the tenures and services are served. * * * this is the true and only reason why joint estates are favoured, in law; at least, i can invent no other.
The court of equity, instead of favouring the right of survivor-ship, hath, on the contrary, opposed it, wherever it could be opposed, without usurping unwarrantable powers.
The only case, in which the right of survivorship doth not seem rigid, groundless, and unjust, is that wherein the teneuts deliberately agree to take their chances for it.
Where the tenents become interested gratuitously, e. g. by devise, to deprive the family of th.e tenent who died first, seems unjust, and more so, if he had improved the land, by bestowing labour and expense upon it. in such a case however their supplication to the court of equity for relief would be vain, perhaps, because that court can no more decree directly against the right of survivorship, the existence of which is recognized bylaw, than, it can alter the law, in any other instance.
If two men. whose object is not of a mercantile nature, for there is no right by survivorship, advance equal portions of the money for lands purchased by them, and conveyed by words, which in construction of law, would transfer a' joint interest, whether the court of equity', simply for the reason that the purchase money was eqnaly advanced, ought to declare the survivor a trustee for the representatives of his deceased companion? is a question upon which an opinion will not now be delivered, because it is unecessary. for
Iu addition to payment by Simon Farley of his proportions of the purchase money, in the principal case, several circumstances, thought abundantly sufficient to constitute Francis Farley a trustee for his brother, as to the lanBs now clamed, occur.
1. The brothers did not intend that either of them should acquire by survivorship a right to the whole estates purchased.— Simon probably did not know that such a right could exist, and certainly did not expect it would be clamed in the event which happened. This is manifest by his testament, which, devising those estates, and appointing Francis an executor, supposed the validity of the one, notwithstanding survivanee of the other, if Simon did not know that the right by survivorship could exist, or did not expect it would be clamed in the event which happened, hence is eoneludeth that he never intended to purchase these estates in such a manner that a right to the whole of them should accrue to the survivor, that Francis did not *260 intend originaly to purchase the estates in that manner is proven, 1, by his abjuration of the right by survivorship, which be thought iniquitous, but which could not be iniquitous if it had been in contemplation oí the parties at the times of the purchases ; and 2, by his purchase, after his brothers death, from Francis Miller of one third part, instead of one half, of the lands in Norfolk, and a court of equity may set aside or reform a conveyance not agreeing with the intention of parties ; for the conveyance written, nor for its own sake but, for exhibiting and fullfiliing that intention, ought to he a true image of its archetype. if it be not so, the court of equity, decreeing a party, holding a legal property by the terms of such a conveyance, to restore so much of it as he ought not to retain, to him, who would have been the legal owner, if the conveyance had faithfully exhibited the intention, is exercising one of the functions universaly conceded to be proper to that tribunal.
2. Accomplishment of an act by Francis Farley, after the legal title by survivorship accrued, for preventing assertion of that title by his representatives, was hindered by failure of counsil to observe instructions sent to him for that purpose.— and when the progress of an act, which is admitted by all to be just, and which the party, confessing himself in honour bound to perform, had begun to perform, hath been interrupted, without any default of him whose benefit was the object, a decree, putting matters in the same state wherein they would have been, if the act had been accomplished, is dictated by the spirit of equity, and believed to be not inconsistent with the practice of this court.
The common rule in a court of equity is, where an agreement made upon a good consideration is not performed, the party interested shall have the benefit to which performance would have intitled him. Strange’s rep. 456. The spirit which suggested this rule cannot disapprove the following rule : where the completion of an act, which one in obedience to the precepts of conscience had earnestly begun to perform, was prevented .against his will, the party interested shall have like benefit as if the act had been completely performed, the instructions to counsil by Francis Farley ; which was the begining of an act intended to secure to his brothers family an estate to which he knew them to be justly intitled, was undoubtedly equivalent to an agreement to that purpose ; and his motive to it, namely, that he might be eased of that compunction, which one conscious of witholding dishonestly the property of another feels, is affirmed with equal confidence to be a good consideration.
*261 Where a legal title, for recovering which a legal remedy had bfeen prosecuted, is rendered an abortion by some évent posterior to institution of the demand, the court of equity may supply that remedy which the law had not provided, e. g. a writ de partitione fachenda between two jointenents will abate by death of either party before the first judgement awarded, although not afterwards, see Bacon’s abr. tit. coparceners (D) where is quoted Dalison 59. in such a case, on application by the heir or devisee of the defendent, if by his death the writ abated, the court of equity, as is believed, would be justified in decreeing a partition, because it, would be the consummation of an act began by the plaintiff himself, if the plaintiff were the party by whose death the writ abated that on behalf of his heir or devisee the court would make a like decree is as little doubted, not only because tbe remedies of the parties ought to he reciprocal, and consequently if the plaintiff surviving would have been compeled to make partition, the defendent in the contrary event ought to be likewise compellable, but because an assignable right ought not to be destroyed by an event, which the owner could not prevent, that is, his own death in the life time of another man, an event against the consequence from which he was actually endeavouring to guard, and in relieving against which the court of equity would exercise one of the powers acknowledged, as is conceived to belong to it
Where a man, intending to settle an estate, over which he hath a power, so that it may be subject to testamentary disposition, or, in default of that, to hereditary succession, neglects a form which the law requires to perfect the settlement, but of which the absence or presence could not influence the intention, tbe party interested shall have tbe benefit to which observance of the form would intitle him. e. g. a writing signed and sealed by one jointenent, declaring tbe intention thereof to be to sever the jointure, and purporting t8 be a conveyance of his moiety of the land in trust for those to whom he should devise it, or for his heirs, if he should not devise it, omits the name of the trustee, or appoints a trustee who had died before, in such a case a court of equity, dispensing with the trustees intervention, who, if he had existed, could not .have done more in the business than his portrait or his statue, would decree the partition, consummating the parties intention ; because that cóurt, if power and will, alone essential naturaly to translation of property, concur, will aid the act designed for a memorial of the translation, supplying defects in the form, in which office the court fullfills the purpose of instituting forms, which was that they might be subservient to the intentions of the parties, not that tbe want of forms should defeat those their intentions.
*262 3, Francis Farley was the agent for his brother in pure" sing the lands, and, when two or more men employed another to purchase lands for them, the presumption being that a wager upon longevity was not in contemplation of the purchasers, the court of equity may with propriety decree the survivor, in case a joint estate be conveyed, to be a trustee of so much as excedes his just proportion, unless instructions to the agent shew the intention of his constituents to have been to take their chances for survivorship; because such a conveyance being an unauthorized act binds not in equity the rights of the constituents, now in this case not only instructions to take a conveyance of a joint estate are not produced, but, that the parties did not design or desire such a conveyance to be taken seems manifest.
4. Francis Farley, Jn 1765, and the year following, debited Simon with proportions of money paid on account of the lands, and particularly for quit rents of those in Northcarolioa, with which the representatives of Simon could not have been justly chargeable, if bis surviving brother remained sole proprietor of the lands. This therefore is an implicit acknowledgement of the right of those representatives. Francis doth not indeed appear to have rendered an account of profits, for which one of his letters contains the reason, that is, the lands had not yielded profits.
5. Francis Farley explicitly, repeatedly, and uniformly acknowledged the right of his brothers representatives to the lands now clamed by them, and that acknowledgement in-cludeth an admission of every thing essential to the perfection of that right, and consequently an admission of a trust in him who held the legal title.
6, The instructions written by direction of Francis Farley, and sent by him to his counsil, were professedly designed to preserve to his brother’s representatives the right which they are endeavoring to assert, these instructions, slighted and disobeyed, contrary to the anxious desire of their author, ought in equity to be deemed a declaration of trust by Mai for the benefit, of those representatives.
II. The next question is whether the plaintiffs, who, being natural born subjects of Great-britain at the time of the am etican separation, did not afterwards become citizens of the united states, are aliens to those states, and consequently disabled to prosecute any action to recover, because disabled to hold, lands of inheritance, in the said states?
The statute of may session, 1779, c. 14 sect I in the preamble recites, that by the separation of the united amerieau *263 states, which had been part of the british empire, the inhabitants of the other parts of that empire became aliens and enemies to the said states, and as such incapable of holding property real or personal acquired therein, and so much of the property as was within this commonwealth became by the laws vested in the commonwealth.
The laws, to which the legislature refers, must be the common law, as is supposed, because no other law then existing is recollected by which aliens are incapable of holding property of any kind, in the country to the sovereign whereof they are not subjects. By the common law, if we allow it to he contained in those archives which alone have hitherto been consulted in order to discover it, a natural born subject of Great-britain cannot by any mean become an alien to those who, at the time of his birth, were his fellow subjects, this appears by 1. Co. Calvins case passim, on which case, one observation by the reporter is, that such a concurrence of judgements resolutions and rides there be in our boohs in all ages concerning this case, as if they had been prepared for the deciding of the question of this point; and that {¿which never fell out in any doubtful case) no one opinion in all our boohs is against this judgement, which observation, unless it can be contradicted, ought to make proselytes to the doctrine asserted in that case those who where before fautors of the contrary doctrine stated in that statute of 1779. c. 14. Francis Bacon, in his argument of the same case, goes so far as to say, if a man look narrowly into the laio in this point, he shall find a consequence ‘that may seem at the first strange, but yet cannot be well avoided; which is, that if divers families of englishmen and woman plant themselves at Middle-borough, or at Moan, or at Lisbon, and have issue, and their descendente do intermarry among themselves, without any inter-mixture gf foreign blood, such descenderás are naturalized to all generations: for every generation is still of liege parents, and therefore naturalized ; so as you may have whole tribes and lineages of english in foreign countries, and to the words quoted by Coke in Calvins case fo. 27 b. from Bracton, the last mentioned author subjoins. ‘ et ita tamen /? contingat guerram mo-veri inter reges, remaneat personalitur quilibet eorum cum eo cui fecerit ligeaniiam, et faciat fervicium debitum ei cum quo non steterit impersona, fol. 427. b.
The inconveniencias from permitting the permanent property in any country to be holdea by those who, although they be not in a legal sense aliens, may be, and actually were in this case enemies, in the popular sense, must not be remedied by judges who have not power to judge according to that which *264 they think to be fit, but that which out of the laws they know to be right, and consonant to law, 7 Co. fol. 27. a. judges must judge according as the law is, not as it ought to be. Taugh '285.
When, out of empires violently dismembered (which was the case between America and Great-Britain) separate, and independent nations are formed, such of the evils, which must happen, both during the conflict, and after it* as can be cured, may be cured by treaties between the nations, when tranquility is restored, more humanely than by fulminating the panoply of escheats, forfeitures,confiscations,involving in distress and ruin many people on both sides innocent, otherwise than by a fiction, of those injuries which caused the separation, (c)
If the common law be as it hath been stated, the recital in the statute of 1779, which was consequently untrue, did not change the law ; for a recital, even in a legislative act, hath not a plastic energy—a declaration that a thing is, which is not, will not make the thing to be. if this statute had recited that by a former statute, which did not exist, the people of other parts of the british empire, born before the separation, were aliens to the united american states, and disabled to hold property within them, such a recital would not have been a legislative act, nor had the force of a law. and if such a recital could have altered the common law in this commonwealth, it would have been ineffectual as to the lands clamed by the plaintiffs in Northcarolina.
Of the remaining questions, which affect the lands in North-carolina only, the third is
III. Whether the plaintiffs, who did not commence this suit within the time prescribed by the statute for limitation of actions in that state are barred?
To which the answer is, the statute is not pleadable by the defendents, who are trustees, because in equity their possession is the possession of the plaintiffs.
By the common law possession is homologous with the right of the possessor, of two men abiding iti the same house, if one only have right to the possession the law shall adjudge him only in possession. Lyttleton’s tenures, sect. 701, et vice versa of two parceners, jointenents, or tenents in common of the same house, if one only abide in the house, the law will adjudge both in possession. See 1 Salk. 285. so that a possession, ac- *265 tualy social, is legaly private, if the right the private ; and a possession, actualy private, is legaly social, if the right be social.
By parity of reason, the possession of the defendents, who were trustees for the plaintiffs, as to their proportion, and in equity tenents in common with them, that is, holding one moiety to their own use, and holding the other moity to the use of the plaintiffs, was in equity the possession of those plaintiffs pro tanto.
IV. The fourth question is, whether a court of equity in this commonwealth can decree the defendents, who are within its jurisdiction, to convey to the plaintiffs lands which are without its jurisdiction ?
The power of that court being,exeroiseable (d) general)' over persons they must be subject to the jurisdiction of the court ; and moreover the acts, which they may be decreed to perform, must be such as, if performed within the limits of that jurisdiction, will be effectual.
That the defendents are subject to the jurisdiction of the court, and atnesnable, to its process hath not been denied ; and that a charter of feoffment containing a power of attorney to deliver seisin, a deed of bargain and sale, deeds of lease and release, or a covenant to stand seised, executed in Virginia, would convey the inheritance of lands in Northcarolina as effectually as the like acts executed in that state would convey such an inheritance, hath not been denied, and is presumed, until some law there to the contrary be shewn, because the place where a writing is signed settled and delivered, in the nature of the thing, is unimportant.
If an act performed by a party in Virginia, who ought to perform it, will be effectual to convey land in Northcarolina, why may not a court of equity in Virginia decree that party, regularly brought before that tribunal, to perform the act?
Some of the defendents counsil supposed that such a decree would be deemed by our brethren of Northcarolina an invasion of their sovereignty, to this shall be allowed the force of a good objection, if those who urge it will prove that the sovereignty of that state would be violated by the Virginia court of equity decreeing a party, within its jurisdiction, to perform an act there, which act voluntarily performed, any where, would not he such a violation.
The defendents counsil objected also, that the court cannot, *266 in execution of its decree, award a writ of sequestration against the lands in Northearolina, because its precepts are not authora-tive there, but this, which is admitted to be true, doth not prove that the court cannot make the decree, because, although it can not award such a writ of sequestration, it hath power confessedly to award an attachment for contempt in refusing to perform the decree, this remedy may fail indeed by removal of the defendants out of the courts jurisdiction, yet such a removal, after the party had been cited, is not an exception which can be interposed to prevent a decree, a court of common law-may enter up a judgement against him, who, by removal of his goods and chatels with himself, after having pleaded to the declaration, or after having been arrested, rendereth vain a capias ad satisfaciendum or a fieri facias, (e)
From a doctrine contrary to that now stated and believed to he correct may result both inconvenience and a failure of justice.
1. A man agrees to sell to another, or holds in trust for another, lands in Georgia, Kentuckey, or one of the new states northwest of the Ohio, but he cannot be decreed to execute the agreement, or to fullfill the trust by any tribunal but that in one of those countries, several hundred miles distant from the country e. g. Northearolina, in which both parties, and the witnesses to prove matters of fact controverted between them, reside, like and greater inconvenienc-ies may happen in numberless other cases, whereas a case can rarely if ever occur, the discussion of which can be so convenient to the defendant in any other as in his own country.
2. An agent employed to purchase land for people intending to migrate to arnerica, or for others, having laid out the money-deposited for that purpose with him by them, and having taken conveyances to himself or to a friend for his use, refuseth not only to make titles to his constituents, but also to discover the lands purchased, they meet with him in one of the states, and in the court of equity there file a bill against him, praying a *267 discovery and a decree for conveyances, be excepts to the jurisdiction of the court as to any lands not lying within that state, and denieth by answer that any lands within that state were purchased by him for the plaintiffs, which was true, the bill in such a case, according to the doctrine^f the defendents counsil in the principal case, must be dismissed, and this must be the fate of every other hill, until he shall have the good fortune to find out in what state the lands purchased are : and if they be in several states, a bill must be filed in every one. if to this be said, that the court may compel the discovery, although it may procede no further, the answer is, that this is directly the reverse of the rule in the court of equity, namely, that the court when it can compel the discovery, will com pleat the remedy, without amanding the party elsewhere for that purpose, and decree to be done what ought to be done in consequence of the discovery.
Therefore the court is of opinion, that Francis Farley the grand father of the female defendents, after the death of his brother Simon Farley, was a trustee for the plaintiffs, the children, devisees, and legatees of the deuendent, as to one moiety of the lands in Northearolina, bought by the brothers from William Byrd, and as to one third part of the lands in the county of Norfolk, in this commonwealth of Virginia, bought by them and Francis Miller from Robert Ives and Keziah his wife, from Anne Ludgal widow, John Biggs and Bathia his wife,-William Dale and Mary his wife, and Sarah Ludgal Spinster, from John Ivy and Elizabeth his wife, and from James Tucker, and that some of the exhibits are proofs of such trust, equivalent to a formal declaration thereof; and that the defend-ents, whose title was not acquired by purchase for valuable consideration, can not bar the demand of the plaintiffs, by length of time ; and that the plaintiffs, whose right accrued before the separation of the united states of America from Great-britdtn, are not disabled to prosecute this suit: and that this court hath jarise!iction thereof, the defendents being ames-nable to its process, and therefore the court, declaring the said Francis Farley to have stood seised, and the defendents now to stand seized of one undivided moiety of the lands in North-carolina, and of one undivided third part of the lands in the county of Norfolk, which proportions are clamed by the bill, in trust to the use of the plaintiffs, doth adjudge order and decree that the defendents, when the females shall attain their ages of twenty one years, do convey the said moiety and third part to the plaintiffs, at their costs ; and in the mean time that the de-fendeuts Thomas Lee Shippen and Champe Carter, and their *268 respective wives, and the guardian of the other defendents, do permit the plaintiffs to enter into and peaceably hold the said moiety and third part and to receive the rents and profits thereof; and that the said defendents do pay unto the plaintiffs one half of the rents and profits of the said lands in North-carolina, and onAhird part of the rents and profits of the said lands in the county of Norfolk from the time of commencing this suit: accounts of which rents and profits are directed to be made up before one of the commissioners of this court, who is required to examine, state and settle the same and make report thereof to the court, with such matters especially as he may think pertinent, or as the parties may require.

 Francis Farley, who appeareth to have expected that the property iJ America of british subjects would be confiscated, probably hoped to prevent the loss of these lands by devising; them to his grandchildren, who were american citizens, praetermitting his brothers children, because a devise to them might be vain.

 That common law courts are disposed to favour jointenancy, and the consequent right of survivorship appeareth by numerous examples, and by none more signaly than the following :
Lyttleton, in the 298 sect of his tenures, saith, if lands be given to two, to have and to hold, s. the one moiety to the one, and to his heirs, and the other moiety to the other, and to his heirs, they are tenents in common, and this hath never been dented to be law, even where the gift was by deed.
But if the lands be given by deed to two, to be equaly divided between them, and their respective heirs, the law hath teen declared by many adjudications to be, that the donees are jointenents, and not tenents in common, the reason of the case in Lyttleton is said by Coke, 1, inst. p. 190. b. to be, because, they have several freeholds, and an occupation pro indiviso; and by Holt, 1. P. Will. p. 18. because the deed operates as several conveyances, and not as one, for two liveries must be made, there being several freeholders, and livery to one, secundum formara chartae, not enuring to the other; and that case is not like to ours, (Fisher v. Wigg) in regard there is an actual division and distribution of the land : whereas the words equaly to be divided, dp not assign several parts.
Yet a man not conversant with law books, nor an admirer of law jargon, would be puzzled to discern a solid difference between the two cases, and would incline to think, with the chancellor, 2 chan. ca. 65, the law was so, because the judges would have it so. he would not haesitate to affirm the donors intention to have been the same in both cases, because the words, i give lands to A and B to be holder), one moiety by A and his heirs, and the other moiety by B and his heirs, and the words, i give lands to A and B, to be equally divided between them and their respective heirs, are convertible terms; for, if one moiety were holden by A and his heirs, and the other moiety were holden by B and his heirs, the lands would be equaly divided between A and B and their respective heirs; and, vice versa, if the lands were equaly divided between A for himself and his heirs, and B for himself and bis heirs, or between A and B and their respective heirs, they would be holden, one moiety by A and his heirs, and the other moiety by B and bis heirs, he would be unable to discover why, in the one case as well as iu the other, the donees might not, according to Coke, have several freeholds and an occupation pro indiviso, and why the deed might not, according to Holt, operate, as several conveyances, and notas one; and why their might not have been two liveries; nor would he be able to reconcile the words of those two judges, of whom, commenting on Lyttletons text, one says the donees have an occupation pro indiviso, that is, an undivided occupation, or no division or distribution of the land being made, and the other says, there is an actual division and distribution of the land.

 May we not hope the period not to be far distant, when tbe regnm ultima ratio wíil gire place to modes of disceptation, rational, just, humane, for terminating national differences, of every kind f what nation by tbeir example, fitter than americans, to recommend those modes.

 Acts of general assembly bare given power to tbe court of equity to condemn the property in this commonwealth, of those who do not reside there, and are not regularly amesnable to the process of that tribunal, to satisfaction of demands against them.

 By the first section of the IV article of the constitution for the united states of America full faith and*credit shall be given in each state to the public acts, records and judicial procedings of every other state, and the subsequent words, and the congress may by general laws preccribe the manner in which such acts, records and procedings, shall be proved, and the effect thereof, seem to shew that provision for such cases as these, among others, was intended to be made, until such provision shall be made, perhaps the decree, judgement or sentence of any state court may be eluded by retirement of the party into another state, yet a bond or other contract is obligatory every where, the sentence of arbitrators is supposed to be binding every where, why should not the sentence of a judge bind the party everywhere else as much as it would have bound him where it was pronounced?